UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


GULF COAST FACILITIES            *        CIVIL ACTION
MANAGEMENT, L.L.C.

versus                           *        NO. 09-3822


BG LNG SERVICES, L.L.C.,         *        SECTION "F"
BG NORTH AMERICA, L.L.C., and
BG EXPLORATION AMERICA, INC.

<u>ORDER AND REASONS</u>

Before the Court are two motions: (1) a motion for summary judgment by BG LNG Services, L.L.C., BG North America, L.L.C., and BG Exploration America, Inc. (collectively, BG); and (2) Gulf Coast's motion for partial summary judgment. For the reasons that follow, the defendants' motion is GRANTED and the plaintiff's motion is DENIED.

<u>Background</u>

This breach of contract action arises out of an oral agreement in which Gulf Coast Facilities Management, L.L.C. contends that BG breached its obligation to pay 10 percent of all revenue and material benefits that Gulf Coast facilitated for BG, even after BG fired it.

For years BG has shipped liquefied natural gas through the Turnbasin at the Port of Lake Charles. In 2005 BG decided to lease about 80 acres of land surrounding the Port; BG did not need the

land for its own operations, but it wanted to have some measure of control over what activities took place there.  Because activities of other companies in the Turnbasin had interfered with BG's shipping, BG wished to sublease the property only to those tenants that could operate without hindering BG's access to the Turnbasin.[1] Accordingly, BG took a leasehold interest in the 80 acres from Trunkline (a company that leased the property) and undertook to sublease that property.

BG worked with outside counsel, David Hunter, who provided a model form sublease to use in negotiating potential subleases.  BG hired a maintenance company, TSI, but also decided to hire a property manager, who would be tasked with negotiating potential subleases with interested parties found by Trunkline, market the property to other potential sublessees, and collect rent.

Kent Morrison, a local attorney, learned through BG's general counsel, Bowe Daniels, who was a contact from law school, that BG was looking for a property manager; in February 2006 Morrison submitted a written proposal to BG.  In the proposal, Morrison described Gulf Coast Facilities Management, LLC as a property management firm with "extensive experience managing and leasing port facilities similar to that held by BG"; that might or might

---

[1] BG obtains, transports, and sells liquid natural gas. It had required unobstructed access to the Turnbasin in order to safely and efficiently unload the liquid natural gas from the massive vessels it uses to transport its product.

not have been true. Gulf Coast, it has been suggested, was not formed until some six or seven months after the proposal to BG -- in September 2006.

Although Morrison represented to BG that the people behind Gulf Coast had significant experience in commercial real estate and in the maritime and port facilities industry, Morrison himself had never before owned or managed any port properties.[2] Morrison's colleague and high school friend, Nat Phillips, had some uncertain experience: Phillips worked part-time for an agriculture company and some of his duties related to port properties. He received his MBA from Tulane University in 2003 but apparently has only performed part-time work from the time he graduated from college in 1995.

After some back-and-forth between Howard Candelet (BG's Vice President of Operations), Kent Morrison, and Nat Phillips, BG and Gulf Coast orally agreed that Gulf Coast would be compensated in exchange for certain property management services to be performed by Gulf Coast at the port property. The specific terms of the oral

---

[2] Morrison had described the individuals involved in Gulf Coast as having experience -- 20 years worth -- in commercial real estate, which gave them "significant and unique contacts within the maritime and port facilities industry." Included in Morrison's proposal was a third person involved in Gulf Coast: Stirling Morrision, however, is not a member of Gulf Coast and ceased any involvement in Gulf Coast "[a]lmost at the beginning of its existence."

agreement are unsurprisingly disputed.[3]  It was generally agreed
that Gulf Coast would help negotiate subleases, using as a model
the lease form already provided by BG LNG's outside counsel.  Gulf
Coast would also help collect rent and identify additional
sublessees.  It is undisputed that Gulf Coast never did.  Gulf
Coast could evict non-paying sublessees, provided advice related to
BG's interest in the Turnbasin, assisted BG and the Port with the
negotiation of an access agreement for a third party, and secured
and managed a mooring arrangement.  At the very least, with regard
to compensation, BG and Gulf Coast agreed that Gulf Coast would
receive a 10 percent commission on rents collected; Gulf Coast was
compensated in the same way each month regardless of which tasks it

---

[3] What is undisputed is that the oral agreement was
wholly lacking in detail: it did not provide whether BG would
deposit rent checks and then pay 10 percent to Gulf Coast, or
whether Gulf Coast would deposit rent checks and then pay 90
percent to BG; it did not provide a term and lacked provisions
governing termination; it did not address whether Gulf Coast would
receive a commission if a sublessee failed to pay its rent; it did
not address issues such as insurance, taxes, consequential damages,
warranties, indemnities, confidentiality, intellectual property
created during the relationship, whether the agreement was
assignable, or how disputes between the parties would be resolved.
          The parties agree that BG had the power to fire Gulf
Coast but they disagree on the consequences of termination:  Howard
Candelet, who negotiated on behalf of BG LNG, understood that BG
could fire Gulf Coast at anytime, and that no further commission
would be owed; Morrison and Phillips, on behalf of Gulf Coast, do
not recall specifically what was said in negotiations regarding
termination, but both state that it was assumed that the 10 percent
commission survived termination.  That it was an agreement
essentially for life.

performed.[4]

Morrison performed most of the work that Gulf Coast did for BG; it is undisputed that whatever work he did for BG he did in his spare time from his work as a full-time attorney in a city law firm.

No one at BG ever inquired into whether Gulf Coast or its principals had a real estate license. In fact, neither Morrison nor Phillips had a real estate license at the time Gulf Coast was formed or while Gulf Coast was working for BG LNG.[5]

---

[4]Gulf Coast contends that the parties agreed that it would receive a 10 percent fee for all value it provided to BG; that commission, Gulf Coast submits, was owed for the life of the sublease. Morrison testified that the agreement between Gulf Coast and BG was that Gulf Coast would receive:

> [t]en percent of all revenue through the property. And that means all revenue, lease revenue, anybody who comes in, docks a boat up next to the side of the facility that -- you have day-rate people who would come in and dock a boat and make money off of that. And we got compensated for any material benefits that we brought in to BG that were not...straight-line 10-percent-of-a-lease kind of deals.

According to Morrison, Gulf Coast was to be paid 10 percent "[f]or whatever we put in place...[t]hat's the extensions on the lease, the life of the lease...." Phillips testified that Gulf Coast was to be paid "ten percent of the value that we created in the property." How that was to be assigned monetary worth, they say, was tied to rents. Independent proof seems nonexistent or scant at best.

[5]Some years before the Gulf Coast venture, Phillips had obtained a real estate license, but once he stopped attending certain mandatory continuing training courses, his license lapsed in about sometime before 2004. Morrison has never had a real estate license.

Using the model sublease form provided by BG LNG's outside counsel, Gulf Coast helped negotiate with potential sublessees already found by BG or Trunkline; some of those potential sublessees executed subleases from BG. Gulf Coast also handled the administrative tasks of receiving rent payments by mail, keeping track of whether the sublessees were current on their rent, and evicting non-paying tenants.

During the time that Gulf Coast was associated with BG, the revenue from the Turnbasin property increased impressively, from approximately $1,000 per month to more than $160,000 per month. According to Gulf Coast, BG's ability to offset the cost of its strategic goals in acquiring control of the Turnbasin was directly attributable to Gulf Coast's expertise.

At some point after Gulf Coast began working for BG, the parties tried unsuccessfully to negotiate a written contract to govern their relationship. BG provided Gulf Coast with a standard contract form or outline that BG used with its vendors and asked Gulf Coast to fill in the relevant terms. Consistent with the oral agreement, Gulf Coast filled in a provision in which it would be paid a 10 percent commission on rent paid to BG. But then Gulf Coast also included in the proposed written agreement that it be paid its 10 percent commission for the life of any sublease BG LNG entered during the time Gulf Coast served as property manager, as well as for the life of any renewals of those subleases. The

parties never executed a written agreement.

In early March 2009, BG fired Gulf Coast.[6]  On June 11, 2009
Gulf Coast[7] sued BG LNG, BG North America, LLC, and BG Exploration
America, Inc., asserting breach of the parties' oral agreement and
unjust enrichment.  Gulf Coast asserts that the parties agreed that
it would be paid 10 percent of the gross revenue earned by BG from
the rental of the property for the duration of each lease, and that
it would also be compensated for "any other material benefits"
negotiated by Gulf Coast on BG's behalf.  Gulf Coast further
asserts that, without Gulf Coast's management of BG's property, BG
would not be receiving more than $170,000 a month or $2,040,000
annually in revenue over the life of the subleases it procured.  BG
filed an answer and counterclaim, asserting that (1) BG is entitled
to recover $120,000 in rent Gulf Coast wrongfully retained after it
collected rent on a lease in which BG was lessor and Seabulk was
lessee; and (2) BG is entitled to recover any other funds

---

[6]The termination letter referred to cost savings as the
reason for termination.  However, BG contends that it became
dissatisfied with Gulf Coast's work.  Specifically, BG contends
that Gulf Coast failed to perform the most important task, which
was to find tenants.  Also BG contends that, even though there were
few tenants, Gulf Coast initially resisted BG's multiple requests
to prepare a monthly accounting, which (BG says) ultimately showed
that Gulf Coast had been underpaying BG.

[7]Since Gulf Coast's termination by BG, Gulf Coast has not
kept its filings active with the Louisiana Secretary of State,
which classifies Gulf Coast as an inactive company; Gulf Coast
never had any employees and neither Morrison nor Phillips ever
invested any money in the company.

unlawfully retained by Gulf Coast, or in excess of what is allowed under the law or facts, or relating to services that Gulf Coast did not properly perform.  Gulf Coast then answered BG's counterclaim, and demanded a jury trial.

BG now moves for summary judgment, contending that the undisputed facts show that the plaintiff lacks a real estate license and that Louisiana law bars an unlicensed person from receiving compensation for real estate services.  In its counterclaim, BG seeks a declaration that Gulf Coast is liable to return funds it received and retained for work it performed for BG without a license.  Gulf Coast, for its part, seeks partial summary relief  regarding the existence and terms of the oral agreement.

## I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a

factual dispute does not defeat an otherwise properly supported motion. _See_ _id_. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. _Id_. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. _See_ <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. _See_ <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. _Id_. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

## II.

"It is well established that statutes are to be construed in such a manner as to effectuate their purpose." <u>Smith v. Cajun Insulation, Inc.</u>, 392 So.2d 398, 400 (La. 1980)(citations omitted). As the state high court has observed, statutes must be construed in accordance with the standard rules for statutory construction:

> A statute's meaning and intent is determined afer consideration of the entire statute and all other

statutes on the same subject matter, and a construction
should be placed on the provision in question which is
consistent with the express terms of the statute and with
the obvious intent of the Legislature in its enactment of
the statute.  Where it is possible, the courts have a
duty in the interpretation of a statute to adopt a
construction which harmonizes and reconciles it with
other provisions.  Moreover, when a law is clear and
unambiguous and its application does not lead to absurd
consequences, it shall be applied as written.  A
construction of a law which creates an inconsistency
should be avoided when a reasonable interpretation can be
adopted which will not do violence to the plain words of
the statute and will carry out the Legislature's
intention. Ultimately, it is clear that the law provides
that the statute be accorded a fair and genuine
construction.  A reasonable construction in light of the
statute's purpose is what is required.

ABL Mgmt., Inc. v. Bd. of Supervisors of Southern Univ., 773 So.2d

131, 135 (La. 2000)(internal citations omitted).

III.

These motions raise issues concerning the scope of the
Louisiana Real Estate License Law, an inartfully drafted statute to
say the least.

Louisiana's Real Estate License Law, it is said, "was founded
on the strong public policy to regulate the real estate business
and it cannot be set aside by contract."  Towne Center, Ltd. v.
Keyworth, 618 So.2d 467, 470 (La.App. 4th Cir. 1993)(citations
omitted).  The broad goal of the law seems to be to enable state
regulation of how and who can conduct the comprehensive span of
real estate activity in this state.  La.R.S. 37:1430, et seq.
Under the law, the Louisiana Real Estate Commission is empowered
to, among other things, regulate the issuance of real estate

licenses, censure licensees, suspend or revoke licenses, and impose

certain requirements on licensees, such as professional competency.

La.R.S. 37:1435.

BG contends that the Real Estate License Law bars Gulf Coast's

recovery as a matter of law because, while Gulf Coast never had a

real estate license, it performed real estate activities in

violation of the statute. Various provisions of the statute are

implicated. The Real Estate License Law first defines the

regulated activities and relevant terms, such as:

> ...
> (6) "Real estate" shall mean and include
> condominiums and leaseholds, as well as any other
> interest in land, with the exceptions of oil, gas and
> other minerals....
> (7) "Real estate activity" means any activity
> relating to any portion of a real estate transaction
> performed for another by any person, partnership, limited
> liability company,...who for a fee, commission, or other
> valuable consideration or with the intention, in the
> expectation, or upon the promise of receiving or
> collecting a fee, commission, or other consideration:
> (a) Sells, exchanges, purchases, manages, rents, or
> leases or negotiates the sale, exchange, purchase,
> rental, or leasing of real estate.
> (b) Offers or attempts or agrees to negotiate the
> sale, exchange, purchase, management, rental, or leasing
> of real estate.
> ...
> (e) Advertises or holds himself, itself, or
> themselves out as engaged in the business of selling,
> exchanging, purchasing, managing, renting, or leasing
> real estate.
> (f) Assists or directs in the procuring of prospects
> of the negotiation or closing of any transaction, other
> than mortgage financing, which results or is calculated
> to result in the sale, exchange, managing, leasing, or
> renting of any real estate, other than a provider of
> information, ideas, and materials to guide the homeowners
> in the sale of their own property.

...
(8) "Real estate salesperson" means a person, other than an associate broker, sponsored by a licensed real estate broker to participate in any activity described in this Section.
...
(18) "Property manager" means one who, for a fee, commission, or other valuable consideration, manages real estate, including the collection of rents, supervision of property maintenance, and accounting for fees received for another.
...
(20) "Real estate transaction" means the selling, offering for sale, buying, offering to buy, soliciting for prospective purchasers, managing, offering to manage, leasing, offering to lease, renting, or offering to rent any real estate....
...
(31) "Property management" means the marketing, leasing, or overall management of real property for others for a fee, commission, compensation, or other valuable consideration.
(32) "Broker" or "real estate broker" means a licensed real estate broker performing activities as an individual real estate broker, a sponsoring broker or designated qualifying broker, or a corporation, partnership, or limited liability company which has been granted a real estate license through a designated qualifying broker.

La.R.S. 37:1431.

The licensing law is meant to be rigorous.

In requiring that one must first obtain a license before engaging in the conduct or activities of a real estate broker or salesperson,[8] an unlicensed person violates the Real Estate License

---

[8]La.R.S. 37:1437(A) mandates that:
Any person desiring to act as a real estate broker or as a real estate salesperson, or any corporation, partnership, limited liability company, or any other legal entity desiring to conduct *real estate activity* in this state, shall file an application for a license with

Law by performing even a "single act" for which a license is required; La.R.S. 37:1436 provides:

> ...
> B.   It shall be unlawful for any person or entity, directly or indirectly, to engage in conduct, or to advertise or hold himself out as engaging in or conducting the business, or acting in the capacity, of a real estate broker or real estate salesperson within the state without first obtaining a license as such broker or salesperson, and being classed as an active licensee....
> ...
> D.   Any person, corporation, partnership, limited liability company, or other entity who, directly or indirectly for another, with the intention or upon the promise of receiving any valuable consideration, offers, attempts, or agrees to perform, or performs any single act described herein, whether as part of a transaction, or as an entire transaction, shall be deemed a licensee or registrant within the meaning of this Chapter.   The commission of a single act by such a person or entity required to be licensed or registered under this Chapter and not so licensed or registered shall constitute a violation of the provisions of this Chapter.

Thus, anyone engaging in the business of real estate salesperson or broker for even one time must be licensed.  La.R.S. 37:1436.  That is, unless they are exempt:   the statute provides for certain exemptions from the licensing requirement; for example, a person or company that sells or leases its own property can do so without first obtaining a license.[9]   La.R.S. 37:1438.  But none of the

_____

the commission....
(emphasis added)

[9]La.R.S. 37:1438 provides that the licensing law does not apply to:

> (1) Any person, partnership, limited liability company, association, or corporation, foreign or domestic, which has not been granted a real estate license in

exemptions is applicable to Gulf Coast.

Another provision of the statute mandates that "[n]o person engaged in real estate activity without a currently valid license shall have the right to receive any compensation for services so rendered." La.R.S. 37:1459(D). Among the civil remedies and penalties that the Commission may impose on anyone engaging in real estate activity without a current license, "the commission may require that any person engaged in real estate activity without a license return any fees collected for engaging in real estate

_____

> Louisiana and which, as owner of lessor, either individually or through an employee or representative and performs acts of ownership with reference to the property owned by him....
>
> (2) The service rendered by an attorney at law on behalf of a client which may be required in the normal course of other legal representation.
> ...
> (5) Any individual, corporation, partnership, trust, limited liability company, joint venture, or other entity which sells, exchanges, leases, or manages its own property....
> (6) Any salaried person employed by a licensed real estate broker for and on behalf of the owner of any real estate which licensed broker has contracted to manage for the owner, if the salaried employee is limited in his employment to [e.g., delivering a lease application; providing information about a rental unit, a lease, an application for lease, or the status of a security deposit or the payment of rent; or assisting in the performance of property management functions by carrying out administrative, clerical, or maintenance tasks.]
> ....

activity." La.R.S. 37:1459(D).

Finally, pursuant to yet another section of the licensing law, courts are forbidden from enforcing contracts for brokerage charges in favor of unlicensed persons. It is this section of the law that the parties most contentiously dispute and which runs amok of an otherwise understandable statutory scheme[10]:

> **§ 1445. Unlicensed persons cannot recover brokerage charges**
>
> No action or suit shall be instituted, nor recovery be had, in any court of this state by any person for compensation for any act done or service rendered, the doing or rendering of which is prohibited under the provision of this Chapter to other licensed brokers or licensed salespersons unless such person was duly licensed under this Chapter as a broker or salesperson prior to the time of offering to perform any such act or service or procuring any promise to contract for the payment of compensation for any such contemplated act of service.

III.

*A.*

Mindful of the statutory scheme, the Court must determine whether the Real Estate License Law bars the plaintiff's claim. The optimum way for BG to prevail would be to convince the Court

---

[10]This provision was amended in 1989 to attempt to limit itself to services by unlicensed persons for licensed ones. Before 1989 this provision was consistent with the framework of the licensing law and the public policy it sought to nurture. One can only rationally explain the 1989 amendment as one that wholly ignores or neglectfully overlooked the other instructions of the licensing law. But "it is the duty of the courts to interpret a provision of law which harmonizes and reconciles it with other provisions pertaining to the same subject matter." See, e.g., Martin v. Safeway Ins. Co. of Louisiana, 26 So.3d 777 (La.App. 3 Cir. 2009).

that the parties' oral arrangement falls within the scope of La.R.S. 37:1445. However, Section 1445, as amended, makes it difficult to conclude post-1989 that the particular provision applies beyond the context of its own internal limitations.

As Gulf Coast reads Section 1445, the 1989 amendment limited the statute's scope so that now it merely prohibits an unlicensed person from receiving compensation for real estate activity he performs on behalf of a licensed broker; Section 1445, insists Gulf Coast, no longer bars, as it once did, an unlicensed person from receiving compensation directly from an unlicensed client.[11] BG counters that Louisiana courts continue to rely on Section 1445 as authority for denying an unlicensed person the right to receive compensation for real estate activity even when the unlicensed person seeks compensation directly from a client.[12]

---

[11]Gulf Coast notes that, before the 1989 amendment, Section 37:1445 provided:

> No action or suit shall be instituted, nor recovery be had, in any court of this state by any person for compensation for any act done or service rendered, the doing or rendering of which is prohibited under the provision of this Chapter.

[12]In support of its contention, BG relies on Schexnayder v. Gish, 948 So.2d 1259 (La.App. 2 Cir. 2007), in which the Louisiana Second Circuit held that the possession of a license is a required element of a plaintiff's claim when he seeks compensation for real estate activity, and that the plaintiff has the burden to allege and prove he has a license. In Schexnayder, the plaintiffs and defendants entered into a so-called Consultant Agreement, in which the plaintiffs agreed to attempt to find a buyer for the defendants' property in return for the commission on

Section 1445 makes Gulf Coast's position more credible but at the same time adds a portion of irrationality to an otherwise clear statutory policy.[13] Other provisions of the statute, however, support BG's ultimate position that unlicensed persons have no right to compensation and add to a more rational statutory regime.

It is clear that BG's leasehold interest in the 80 acres at

---

the sale of the property to any buyer the plaintiffs found. When the plaintiffs found a buyer who purchased the property, the defendants refused to pay the promised commission to the plaintiffs. The plaintiffs sued. The district court dismissed their claim at the pleading stage on the ground that they lacked a real estate license. The plaintiffs appealed, contending that the defendants had failed to prove the plaintiffs lacked a license. Id. In reaching its decision that the possession of a license is a required element of a plaintiff's claim, the Second Circuit cited Rainey v. Riley, 388 So.2d 110, 111 (La. App. 1 Cir. 1980)(proof that plaintiff has a real estate license is "an essential element of any suit for commission"). Also, in an unpublished opinion, a federal district court relied on Schexnayder and Rainey in granting a defendant's motion to dismiss based on La.R.S. 37:1445. Retail Estate, Inc. v. Perkins Rowe Assocs., L.L.C., No. 07-712 (M.D. La. Oct. 19, 2007)(dismissing Retail Estate's complaint to recover commissions owed based on a listing agreement with Perkins Rowe because neither Retail Estate nor its agents are licensed realtors).

[13]Plaintiff's effort to elicit some rational relationship between Sections 1445 and 1459 is at best wanting and inconsistent: To speculate that the 1989 amendment to Section 1445 intended to limit statutory private rights of action to those cramped situations in which only unlicensed persons prey on licensed persons, betrays the apparently broader state policy purpose of real estate licensing oversight. It is inconsistent because plaintiff agrees that although the Commission has primacy in regulatory and punishment authority, defendant might nevertheless have private claims under the Louisiana Civil Code (if provable) to force plaintiff's return of wrongfully withheld monies, but may not assert that same Civil Code as a defense to conduct made illegal by Section 1459. See La.Civ.Code arts. 2299 and 2300.

the Turnbasin constitutes "real estate" as defined by La.R.S. 37:1431(6). Leasing this "real estate" constitutes a "real estate transaction" as defined by La.R.S. 37:1431(20). Pursuant to La.R.S. 37:1431(7), any work by a person or limited liability company "relating to any portion of a real estate transaction", including the leasing or negotiation of leases, constitutes broadly defined "real estate activity." Further, to the extent the record reflects that Gulf Coast also engaged in property management such as "marketing, leasing, or overall management of real property" (La.R.S. 37:1431(31)) for BG, Gulf Coast was a "property manager" insofar as it managed BG's real estate and collected rents. La.R.S. 37:1431(18).

Because the licensing law makes it illegal for any person who lacks a current real estate license to "offer[], attempt[], or agree[] to perform, or perform[] any single act" encompassed by the Real Estate License Law (La.R.S. 37:1436), the defendants contend that Gulf Coast cannot recover under the parties' oral agreement for commission on the leased property; BG invokes the Civil Code principle that one cannot enforce an illegal contract. La. Civ. Code art. 2030. The Court agrees. The Civil Code mandates that "[a] contract is absolutely null when it violates a rule of public order, as when the object of the contract is illicit or immoral." La.Civ.Code art. 2030. The absolute nullity of a contract may be asserted "by any person or may be declared by the court on its own

initiative." Id. The Civil Code further provides that "[p]ersons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity." La. Civ. Code art. 7.[14]

Gulf Coast does not dispute that it lacked a real estate license or that it performed at least a "single act" covered by the Real Estate License Law. Indeed, it seems clear that much of Gulf Coast's work, including attempting to market BG's leasehold interest to potential sublessees, negotiating subleases, and collecting rent, falls within the scope of the requirements of the licensing law. Accordingly, pursuant to La.R.S. 37:1436 and 1459, Gulf Coast has violated the Real Estate License Law and is statutorily barred from claiming compensation for its services.

Gulf Coast compartmentalizes what it did, so as to salvage some of its claims and also raises technical pleading issues:

------

[14]The Court notes that the Fifth Circuit and another Section of this Court have observed that Louisiana courts rely on these Civil Code articles to invalidate contracts made in violation of other licensing requirements, such as the building contractor license law. See, e.g., Tradewinds Environmental Restoration, Inc. v. St. Tammany Park, LLC, 578 F.3d 255, 259-60 (5th Cir. 2009)(affirming district court's ruling that mold remediation contract was an absolute nullity since contractor lacked Louisiana license and noting that "Louisiana courts have long recognized that statutory licensing requirements 'were enacted to protect an interest vital to the public order,' and have relied on these Civil Code articles to invalidate contracting agreements entered into with unlicensed contractors); Touro Infirmary, Preferred Continuum Care-New Orleans, LP v. Traverlers Prop. Casualty Co. of America, No. 06-3535, 2007 WL 496858, at *3 (E.D. La. Feb. 13, 2007)(Vance, J.)(determining that contract to repair hurricane-damaged hospital was void).

first, it attempts to avoid the application of the statute by suggesting that BG has the burden of raising the illegality of Gulf Coast's conduct. This contention is undermined by <u>Schexnaydre</u>, 948 So.2d 1259. Even if BG has the burden of raising illegality of Gulf Coast's conducting real estate activity without a license,[15] BG did plead illegality of Gulf Coast's conduct as an affirmative defense (at paragraph 34 of its Answer and Counterclaim, BG asserted that Gulf Coast's claim was barred because Gulf Coast's actions were "inconsistent" with "statute, regulation, or other law"). Such tit-for-tat is unhelpful to either side. Moreover, in any event, Gulf Coast does not dispute that it lacked a real estate license. Finally, to the extent that Gulf Coast disputes whether BG adequately pleaded illegality as an affirmative defense, Gulf Coast clearly suffered no prejudice, and offers up none, considering especially that BG raised the issue early enough in the

---

[15]Gulf Coast invokes two state appellate court decisions from the 1940s and 1950s in which the courts held that a plaintiff's lack of a license is an affirmative defense. <u>See</u> <u>Ruiz v. Trocchiano</u>, 38 So.2d 184 (La.Ct.App. 1949)(nonpayment of the broker's license is an affirmative defense that must be set up and proved by the defendant); <u>Bruno v. Gauthier</u>, 70 So.2d 693 (La.Ct.App. 1954). BG suggests that because the law has changed since then, Louisiana appellate courts have held that the possession of a license is a required element of the plaintiff's claim, which the plaintiff must allege and prove, rather than an affirmative defense that the defendant must plead and prove. <u>See</u>, <u>e.g.</u>, <u>Schexnaydre</u>, 948 So.2d 1259; <u>Rainey</u>, 388 So.2d 110; <u>cf.</u> <u>Retail Estate, Inc.</u>, No. 07-712 (M.D. La. Oct. 19, 2007)("to state a cause of action for [commission arising from a listing agreement] plaintiff must be a Louisiana licensed real estate broker or agent").

proceedings: by questioning Gulf Coast's two principals about whether they had a real estate license during their depositions (which were the first ones taken) and by raising the issue in the present motion which was filed well before trial. See Weiss v. Allstate Ins. Co., 512 F. Supp. 2d 463, 467-68 (E.D. La. Apr. 9, 2007)(Vance, J.). In Weiss, another Section of this Court held that, while failure to plead an affirmative defense generally results in waiver of that defense, the Federal Rules of Civil Procedure nevertheless require any inquiry into whether the defendant has met the fair notice requirement. Id. In so inquiring, the Weiss court determined that the plaintiffs had been on notice of the defendant's judicial estoppel affirmative defense for at least two months before trial, which constituted fair notice such that the defendant had not waived its defenses. Id. The rationale of Weiss applies here as well.

Gulf Coast also seeks to avoid application of the Real Estate License Law by contending that at least some of the types of services provided to BG by Gulf Coast fall outside the scope of the statute. That is, Gulf Coast suggests that it served as a consultant (and not a broker or salesperson) and performed other discrete tasks not covered by the license law. Without clear support that the Court could compartmentalize Gulf Coast's recovery, Gulf Coast elevates mere semantics over substance. While Gulf Coast concedes that it negotiated with sublessees, saw to the

eviction of non-paying tenants, attended hearings, provided planning to BG to secure its strategic interests, drafted and revised subleases, and performed activities that fall within the broad parameters of a property manager, Gulf Coast insists that it never did the type of tasks that are the real estate agents' and brokers' reason for existence– the marketing of and solicitation of tenants (although apparently it was supposed to). Gulf Coast provides no support for its assertion that it may recover for those tasks it argues fall outside the scope of the statute even though it admittedly performed many tasks that fall within its reach. Nor does Gulf Coast suggest how the Court would be tasked with segregating how much each activity was worth in the mix of the 10 percent commission.[16] In the context of a hybrid agreement, in

---

[16]Indeed, the very language of the statute undermines Gulf Coast's argument: in particular, to reiterate, Section 37:1436(D)(emphasis added) provides:

D. Any person, corporation, partnership, limited liability company, or other entity who, directly or indirectly for another, with the intention or upon the promise of receiving any valuable consideration, offers, attempts, or agrees to perform, or performs *any single act* described herein, *whether as part of a transaction, or as an entire transaction*, shall be deemed a licensee or registrant within the meaning of this Chapter. *The commission of a single act by such a person or entity required to be licensed or registered under this Chapter and not so licensed or registered shall constitute a violation of the provisions of this Chapter.*

which part of the contract would be lawful and part would be void under the license law, at least one state appellate court has suggested that such hybrid agreements would violate La.R.S. 37:1436. Towne Center, Ltd. v. Keyworth, 618 So.2d 467 (La.App. 4 Cir. 1993).

Gulf Coast alternatively contends that, because BG benefitted from Gulf Coast's work, Gulf Coast can still recover its commission. In so contending, it relies on estoppel: BG, the argument goes, is estopped from arguing that Gulf Coast is not entitled to the benefit of the parties' oral agreement. The Court disagrees. Louisiana courts have rejected attempts of unlicensed persons to recover on other, quasi-contractual theories "regardless of the benefit they may have provided." See Brown v. Williams, 587 So.2d 732, 738 (La.App. 2 Cir. 1999); see also Retail Estate, Inc., No. 07-712 (M.D. La. Oct. 19, 2007)("equitable considerations cannot be permitted to prevail when in conflict with written positive law[; therefore,] plaintiff cannot make claims in estoppel"); Franklin v. Blount, No. 06-847, 2007 WL 437691, at *2 (La. App. 1 Cir. Feb. 9, 2007)("Equitable considerations and estoppel cannot be permitted to prevail when in conflict with positive written law"); Century 21 Flavin Realty, Inc. v. Erwin Heirs, Inc., 657 So.2d 108 (La.App. 3 Cir. 1995)(noting that the plaintiff "has not referred us to any jurisprudence which supports a real estate broker's claim for commissions based solely on the

theory of quantum meruit"); <u>Brumfield v. Brumfield</u>, 450 So.2d 1019
(La.App. 1 Cir. 1984)(holding that, to the extent the plaintiff
invokes principles of equity and unjust enrichment, "the court
finds such principles inapplicable in the face of a clear statutory
prohibition").

*B.*

Finally, there is the issue of the defendants' counterclaim:
whether Gulf Coast must repay part of the commissions because much
of Gulf Coast's work was "real estate activity" which was performed
contrary to law.  BG contends that Gulf Coast is obligated to
reimburse BG for the compensation it previously received, with the
quantum to be determined at trial.  BG insists that the Louisiana
Civil Code supports its argument that one can be reimbursed if he
pays something that was not owed.  The Court agrees.  La. Civ. Code
art. 2299 provides that "A person who has received a payment or a
thing not owed to him is bound to restore it to the person from
whom he received it."  La. Civ. Code art. 2300 provides that "A
thing is not owed when it is paid or delivered for the discharge of
an obligation that does not exist."  Indeed, requiring an
unlicensed person engaging in real estate activity to return fees
collected has textual support: among the civil remedies and
penalties that may be imposed on anyone engaging in real estate
activity without a current license, "the commission may require
that any person engaged in real estate activity without a license

24

return any fees collected for engaging in real estate activity."
La.R.S. 37:1459(D).  Thus, Louisiana law clearly provides BG a
theory of recovery.

Accordingly, the defendants' motion is GRANTED and the
plaintiff's motion is DENIED.  A determination as to the quantum
of BG's counterclaim must await trial.[17]

New Orleans, Louisiana, August 2, 2010.


_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[17]Whether the plaintiff can rely on article 2055 of the
Louisiana Civil Code in defense of BG's counterclaim is not an
issue that has been raised, or addressed, as yet.